UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 26-20114-CR-LEIBOWITZ

UNITED STATES OF AMERICA,

Plaintiff,

v.

MARTIN ESHO,

Defendant.
_______________________________________/

**DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO SUPPRESS**

NOW COMES Defendant MARTIN ESHO, by undersigned counsel, and replies to the Government's Response in Opposition (Dkt. 50) to his Motion to Suppress (Dkt. 40).

The Response rests on facts no witness has sworn to: one plainclothes officer, a concealed and holstered weapon, an unlocked door, a traveler free to roam a waiting area with vending machines. Dkt. 50 at 2–4. None of it is in a declaration, and the Government's own reports contradict parts of it. The Response also concedes the facts that matter. No agent read Mr. Esho his rights. He "did not read all parts verbatim." And by the time HSI's child-exploitation agents arrived, the inspection had "transformed into a criminal investigation." *Id.* at 3–4, 18. The Response is silent on the half hour before the recording began, the threat of arrest, and the two-step argument. The Government bears the burden on waiver, and it cannot carry that burden with a brief.

## I. THE MOTION CANNOT BE DECIDED WITHOUT AN EVIDENTIARY HEARING.

The Government asks the Court to deny the motion without a hearing. Dkt. 50 at 2. To warrant a hearing, a motion must be "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented"; it "must allege facts which, if proven, would provide a basis for relief." *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985). The motion identifies the times, reports, recording, and testing on which it

rests. Dkt. 40 at 3–10. The Response does not dispute that record. Instead it adds facts asserted only by counsel, and "[s]tatements by counsel in briefs are not evidence." *Skyline Corp. v. NLRB*, 613 F.2d 1328, 1337 (5th Cir. 1980). Several of those facts are contradicted by the Government's own documents.

(1) The Response calls the encounter a "standard customs inspection" and says the device search followed "routine background questions." Dkt. 50 at 2–4. CBP's report states that Mr. Esho "was selected for interview and inspection by the Miami International Airport's Human Trafficking Unit . . . due to ESHO frequent trips to Colombia." Dkt. 40 at 24. The media examination was conducted because Colombia "is a country know[n] for commercialized sex, child exploitation, or human trafficking to the United States." Dkt. 40 at 29.

(2) The Response says Officer Flores did not touch Mr. Esho. Dkt. 50 at 3. CBP's report records a "[p]at down" that was "requested and approved by" a supervisor, with the times redacted. Dkt. 40 at 30.

(3) The Response says Mr. Esho was "free to move around the secondary waiting area." Dkt. 50 at 3. Officer Flores's own report, sent at 4:59 a.m. the next morning, says no such thing. Dkt. 40 at 23–25. HSI's report says that after the interview Mr. Esho "was escorted back to CBP secondary." *Id*. at 35.

(4) The Government's filings disagree on when Mr. Esho was arrested: March 7, Dkt. 42 ¶ 1, or March 8, Dkt. 50 at 6. The recording opens with an agent announcing, "It is March 7th, 11:59." Dkt. 50-1 at 1.

(5) The Response says nothing about the twenty-nine minutes between the agents' arrival at 23:30 and the start of the recording, Dkt. 40 at 24, or about Mr. Esho's statement that he was told he would be arrested if he did not speak with the agents, *id.* at 4. An argument the Government does not answer is not one the Court should resolve in its favor.

Mr. Esho bears the burden on custody. *United States v. Woodson*, 30 F.4th 1295, 1302 (11th Cir. 2022). The Government bears the burden on waiver and voluntariness. *Miranda v. Arizona*, 384 U.S. 436, 475 (1966); *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). Each disputed fact above goes to one burden or the other, and none can be resolved on a brief.

## II. THE GOVERNMENT HAS NOT SHOWN A KNOWING AND INTELLIGENT WAIVER.

### A. Official coercion is not an element of the comprehension prong.

The Response leads with the rule that a waiver is not involuntary without official coercion. Dkt. 50 at 16–17. That rule governs only the first prong. The Government's own authority says so, and the Government itself acknowledges that comprehension is a separate prong. *Id*. at 18. *Barbour* applied the coercion requirement to "the first prong, whether the waiver was made voluntarily." *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995). It then decided "the second prong" separately, relying on the defendant's own testimony that he would have understood his rights and on his "educational and military experience." *Id*. at 585–86. Another of the Government's cases states the rule this motion turns on: "the government had to prove the defendant had capacity to understand the Miranda warnings." *United States v. Glover*, 431 F.3d 744, 748 (11th Cir. 2005) (citing *Tague v. Louisiana*, 444 U.S. 469 (1980) (per curiam)), abrogated on other grounds by *Johnson v. United States*, 559 U.S. 133 (2010). And the Government cites *Miller v. Dugger*, which holds: "If a defendant cannot understand the nature of his rights, he cannot waive them intelligently." 838 F.2d 1530, 1539 (11th Cir. 1988). No coercion is needed to reach that result.

*Glover* also shows what the Government lacks. The defendant there relied on his mother's testimony, which was "not corroborated by an expert evaluation" and which the court called "vague and uncorroborated." 431 F.3d at 748. The government answered with evidence that the defendant "interacted normally and intelligently with the arresting agents" and "was familiar with the criminal justice system." *Id.* Here the positions are reversed. The deficit is documented by school testing, a psychologist, and a psychiatrist. Dkt. 40 at 6–9. Mr. Esho had

no prior arrest. *Id*. at 14. And the Government offers a transcript and argument, but no testimony or declaration.

**B. The Government's own transcript shows the warnings did not reach him.**

The Response concedes that no agent read the warnings. An agent "asked the Defendant to read the warnings out loud." Dkt. 50 at 4. It concedes that he "did not read all parts verbatim," but says "he read the essential rights." *Id.* at 18. The Government's own transcript refutes that. As the Government transcribes it, Mr. Esho read the second, fifth, and sixth warnings this way: "Anything can be used in court and law proceedings .......Attorney will be obtained before you wish. If you could answer the questions, um, anytime, stop the questions, pursue consulting an attorney." Dkt. 50-1 at 7. The words "against you" are gone. So are "if you cannot afford an attorney" and "appointed." Those are not peripheral words. *Miranda* requires a warning "that any statement he does make may be used as evidence against him," 384 U.S. at 444, and a warning "that if he is indigent a lawyer will be appointed to represent him," *id*. at 473. Neither reached Mr. Esho. On each omission the motion identified, the Government's transcript matches the defense transcription. *Compare* Dkt. 50-1 at 7, *with* Dkt. 40 at 5.

The Court should listen to the reading rather than rely on a transcript of it. Rec. at 00:04:56–00:06:30. A transcript records which words were spoken. It cannot show whether the reader understood them, and that is the question. Dr. Reddy, who reviewed the recording, found the reading "broken and uneven rather than continuous." Dkt. 40 at 67 (Reddy Rep.). Mr. Esho "paused between short parts of sentences and appeared to have difficulty getting through the more complicated language," and his reading "was also slow." *Id.* Even a fluent reading would not settle the question: "[h]is ability to pronounce words or read a document aloud ......cannot be equated with understanding its legal meaning." *Id.* at 63. As the motion stated, Mr. Esho will offer the relevant portions of the recording at the hearing and will provide a copy to the Court on request. *Id.* at 4.

The signature does not fill the gap. The Government quotes half a sentence from *Bernal-Benitez* and omits the half that matters. Dkt. 50 at 18. The full sentence reads: "A signed Miranda

waiver is usually strong evidence that the defendant waived his rights, but it is not necessary." *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010). The court then quoted *Butler*: an express waiver "is not inevitably either necessary or sufficient to establish waiver." *Id.* (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

**C. The pilot certificate proves persistence, not comprehension.**

The Government calls the defense premise "demonstrably false—and frankly, ridiculous." Dkt. 50 at 17. It is attacking a premise the motion never made. The motion does not claim that Mr. Esho cannot speak English or read words aloud. It shows that decoding is his relative strength and reading comprehension is his deficit. Dkt. 40 at 7, 14. A pilot certificate and a fluent conversation speak to the first. The waiver turns on the second.

The Government's own exhibit explains the certificate.   told the agents that he "got rejected many times," "failed multiple, um, courses," and was told, "hey man, this isn't for you." Dkt. 50-1 at 37. He reported taking the written pilot examination eleven times, Dkt. 40 at 68 (Reddy Rep.), and studying ten years for the license, *id.* at 70. Mr. Esho logged more than 130 hours of flight time. The regulations require at least 40 hours of flight time, and as few as 35 in an approved course. 14 C.F.R. § 61.109(a), (k)(3). The FAA record lists "ENGLISH PROFICIENT" under "Limits." Dkt. 50-2. That entry does not measure whether he can read and understand a legal waiver. The assertion that his devices show he "regularly conducts his own business in English," Dkt. 50 at 18, comes with no exhibit and no citation.

**D. The Government does not address the threat.**

The Response says Mr. Esho "never argues that law enforcement took advantage of" his deficits, Dkt. 50 at 18, and that the agents "never made any promises," *id.* at 17. The motion argues that he was told he would be arrested if he did not speak with the agents, and that the threat, combined with his limitations, rendered the waiver and his statements involuntary. Dkt. 40 at 2, 4, 11. The Response does not deny the threat. And the Government's transcript records an agent, sixteen minutes in, telling Mr. Esho: "If it's digital things, you know, we can work past that, right?" Dkt. 50-1 at 14. That is the kind of assurance the Response says was never given.

What was said before the recording, and its effect on a man with Mr. Esho's limitations, are questions for the hearing.

## III. THE PRE-WARNING STATEMENTS WERE CUSTODIAL.

The Response addresses the HSI interview as if it were part of a routine entry inspection. Dkt. 50 at 15. The border rule rests on the expectation that travelers will be questioned as a routine part of entry. *United States v. Moya*, 74 F.3d 1117, 1119–20 (11th Cir. 1996). Because "some degree of questioning and of delay is necessary and is to be expected at entry points," questioning must become distinctly accusatory before custody attaches. *Id.* at 1120. That premise does not reach this interview, and the test is objective. *Id.* at 1119. Consider what a reasonable person in Mr. Esho's position would have seen. The baggage examination ended at 22:50 with negative results. Dkt. 40 at 24. He was not released, and the officers kept his telephones. Dkt. 50 at 4. He was held for HSI, whose agents arrived at 23:30. Dkt. 40 at 24. Two men who introduced themselves as "special agents with Homeland Security" then questioned him in a closed room. Dkt. 50-1 at 1; Dkt. 50 at 4. The Government itself calls what was underway by then a "criminal investigation." Dkt. 50 at 3–4. None of that is routine entry processing. The Response does not answer the point, the unrecorded half hour, Dkt. 40 at 17, or the two-step argument, *id.* at 18.

The pre-warning questions were not booking questions. Dkt. 50 at 15. The booking exception covers "questions to secure the biographical data necessary to complete booking or pretrial services." *United States v. Morgan*, 143 F.4th 1264, 1273 (11th Cir. 2025) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality opinion)). How long Mr. Esho stayed in Colombia and whether he traveled alone, Dkt. 50-1 at 5–6, are not booking data. They go to the subject that brought the Human Trafficking Unit to him. Dkt. 40 at 29. The Government also concedes the questions "largely captured information already provided upon entry." Dkt. 50 at 15. In *Morgan*, the Eleventh Circuit refused to extend the exception to a question officers had

already asked and had answered: the first exchange "took care of any legitimate administrative concerns." 143 F.4th at 1274.

The Response calls Mr. Esho's first recorded statement "spontaneous." Dkt. 50 at 15. Whether it was depends on what was said in the twenty-nine minutes before the recording began, and the Government does not say.

**IV. THE PASSCODE IS TESTIMONIAL.**

The Government's own authority answers its suitcase analogy. A suitcase opens with a key. A passcode comes from the mind, and when compliance requires a person to draw on the contents of his own mind, it is "like telling an inquisitor the combination to a wall safe, not like being forced to surrender the key to a strongbox." *United States v. Hubbell*, 530 U.S. 27, 43 (2000); *see In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d 1335, 1346 (11th Cir. 2012). Mr. Esho was asked to provide the passcodes, and he did. Dkt. 50 at 3. *Hubbell*'s passage on "obedience to a regulatory requirement" concerns records and reports the law requires: "filing an income tax return, maintaining required records, or reporting an accident." 530 U.S. at 35. The Government identifies no statute or regulation that requires a traveler to disclose a passcode. Section 162.6 makes "persons, baggage, and merchandise" arriving from abroad "liable to inspection and search." 19 C.F.R. § 162.6. It says nothing about compelling a traveler to speak. The Government's own footnote confirms the point: had Mr. Esho refused, the consequence would have been detention of the devices, not a violation of any regulation. Dkt. 50 at 3 n.2. It cannot be ignored that the contents of a suitcase and the contents of a cell-phone in today's society bear no similarity. Today, our phones are extensions of ourselves. They include the most private and sensitive pieces of information a person can possess.

*Patane* does not help the Government. The motion seeks suppression of the passcode as a statement. It does not seek suppression of the contents of the telephones on Fifth Amendment grounds. Dkt. 40 at 18–19. *Patane* concerns "physical evidence resulting from voluntary

statements." *United States v. Patane*, 542 U.S. 630, 634 (2004) (plurality opinion). A passcode is not physical evidence, and the Government cites no case treating it as physical fruit. Dkt. 50 at 14.

**V. THE FORENSIC SEARCH REQUIRED A WARRANT.**

The Response says Mr. Esho argues "that border searches can only occur before arrest." Dkt. 50 at 20. He does not. "Mr. Esho does not argue that delay alone ends a border search. The line is the charge…" Dkt. 40 at 20. None of the Government's cases decides whether a search made after the Government has filed a complaint and brought the defendant before a magistrate judge remains a border search. In *Ickes*, agents searched the van at the border while the defendant was in custody there, before he was interrogated. *United States v. Ickes*, 393 F.3d 501, 503 (4th Cir. 2005). In *Pulido*, officers seized the devices at entry and sent them to an agent for forensic search. The opinion describes no charge pending at the time. *United States v. Pulido*, 133 F.4th 1256, 1265–66 (11th Cir. 2025). The Government cites the district court's decision in *Kolsuz*, Dkt. 50 at 20, but not the Fourth Circuit's. The Fourth Circuit rejected the argument that arrest alone ends the exception. *United States v. Kolsuz*, 890 F.3d 133, 142 (4th Cir. 2018). Mr. Esho does not make that argument. The opinion does not say whether Kolsuz had been charged during the month-long search that followed his arrest. *See id.* at 136. And in *Ramos*, after the arrest, the agents "obtained a search warrant to conduct a full forensic examination of the phone." *United States v. Ramos*, 190 F. Supp. 3d 992, 995 (S.D. Cal. 2016).

The Government's only justification is the interest in keeping contraband out. Dkt. 50 at 20–21. Mr. Esho acknowledges that *Pulido* holds the exception is not limited to searches for contraband. 133 F.4th at 1274–75. But neither *Pulido* nor any other case the Government cites addresses a search made after the Government invoked this Court's criminal process. By then, HSI had held both telephones "under their own authority" in an evidence bag since 01:25 on March 8. Dkt. 40 at 25. The Government concedes that the extractions began on March 9, after the arrest, and were performed at HSI's offices. Dkt. 50 at 6, 20. It had probable cause, the

devices, and a magistrate judge on the telephone that day, and it did not ask her for a warrant. Dkt. 40 at 19-20. It does not invoke the good-faith exception or inevitable discovery. *See* Dkt. 40 at 20.

## VI. CONCLUSION

Mr. Esho requests that the Court set an evidentiary hearing and, after the hearing, grant the motion and suppress items (1) through (4).

Dated: October 28, 2026

Respectfully submitted,

*/s/ David Tarras*
David Tarras, Esq.
Florida Bar No. 125746
Law Office of David Tarras, PLLC
1200 North Federal Highway, Suite 300
Boca Raton, Florida 33432
Phone: (954) 592-9416
David@TarrasDefense.com

Matthew Amarin (admitted *pro hac vice*)
Amarin Law, PLLC
1935 W. Belmont Avenue
Chicago, Illinois 60657
(773) 503-8223
matthew.amarin.esq@gmail.com

Counsel for Defendant Martin Esho

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 28, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a copy on all counsel of record.

*/s/ David Tarras*
David Tarras